# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 11, 2013

## STATE OF TENNESSEE v. LEONEL LOPEZ,
## aka LEONEL LOPEZ RAMOS

**Appeal from the Criminal Court for Davidson County**
**No. 2011-C-2591     Seth Norman, Judge**

---

**No. M2013-01264-CCA-R3-CD - Filed February 24, 2014**

---

The defendant, Leonel Lopez, also known as Leonel Lopez Ramos, was convicted by a Davidson County Criminal Court jury of second degree murder and sentenced to twenty years as a violent offender in the Department of Correction. On appeal, he argues that: (1) the evidence is insufficient to sustain his conviction, and (2) the service of a convicted felon as the grand jury foreman invalidated the indictment against him as a matter of law. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Joseph L. Morrissey, Jr. (on appeal) and Ivan Lopez (at trial), Nashville, Tennessee, for the appellant, Leonel Lopez, aka Leonel Lopez Ramos.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin N. Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was charged with first degree murder as a result of the assault and subsequent death of his girlfriend, Ana Cruz, at Guadalajara Bar where she worked in Nashville, Tennessee, on May 3, 2011.

Franklin Guillen, the victim's son, testified that he was eighteen years old and a high school student when the victim died. He had a younger brother who was three years old when the victim died. At the time of the assault, the victim lived with her two sons and the defendant, who was her boyfriend. The defendant lived in the victim's home for two to three months before the assault. The defendant worked at a restaurant in downtown Nashville, and the victim worked as a manager at Guadalajara Bar. The defendant went to Guadalajara Bar every day to see the victim. The bar closed at 1:00 a.m. on week nights and 3:00 a.m. on weekends.

Guillen testified that he learned of the assault against his mother when the police came to his house and notified him. He visited her at Vanderbilt Hospital, though she never regained consciousness. He was present when the doctors removed the victim from life support. He saw the injuries to the victim's body, including bruises on her arms and injuries to her head.

Guillen testified that the defendant moved out of the victim's house the day of the assault. When Guillen got home from school that day, the defendant's belongings were not there and the victim's bedroom "was a mess." He went to the bar where his mother worked to ask her what had happened, and she told him that she had asked the defendant to leave because "he kept blaming her and she was tired of him."

Guillen testified that, about a week before the assault, he was awakened in the middle of the night by the defendant and a friend arguing with the victim. He heard his mother ask the defendant to leave and, the next day, she had bruises on her face. He asked his mother about the bruises, but she would not tell him what happened. During the time the defendant lived with them, Guillen noticed bruises on his mother on several occasions.

Augustin Bustillo, through an interpreter, testified that he knew both the victim and the defendant. He was present at the bar the night of the assault, having arrived between 11:00 p.m. and midnight. The defendant was at the bar with some other people when Bustillo arrived, some of whom Bustillo knew and one he did not. Bustillo did not drink any alcohol that night, but the defendant and his companions were drinking beer. When the victim was ready to close the bar, she asked the defendant to leave. Bustillo heard the victim say, "You-all have to leave because it's time to close the place." The defendant responded to the victim, "[Y]ou and how many people are going to take me out of here." The victim told him that "if he didn't want to leave she wasn't going to take him out of there, the police would." At that time, the only people remaining in the bar were himself; Mari and Carmen

Sanchez,[1] who were working as waitresses; the victim; and the defendant and his friends.

Bustillo testified that the defendant told the victim to call the police, and they began to argue. Bustillo dialed 911 but did not say anything to the operator, thinking that the defendant would stop upon seeing Bustillo calling the police. The victim turned around, and the defendant "took her by the shoulder and then by the shirt, and he hit her with his fist in the face." The victim fell to the ground, and Bustillo grabbed the defendant. The defendant told Bustillo not to touch him and then punched him in the stomach. The defendant turned back to the victim and kicked her while she was on the ground. The victim tried to get away from him. The defendant grabbed a pool stick, and his companions, who were evidently the defendant's cousins, tried to take the pool stick out of his hands.

Bustillo testified that he did not know how many times he saw the defendant kick the victim, but said that it occurred many times. He also saw the defendant grab the victim by the hair. The victim crawled under a pool table, but the defendant pulled her out and continued kicking her all over her body, focusing mostly on her head. Mari screamed at the defendant to stop, and the defendant lifted his hand up like he was going to hit her. Mari told him that he could not hit her because she was pregnant, to which the defendant responded, "And[?]"

Bustillo went to the beer supply room and called 911, actually speaking to an operator this time. While he was in the closet, Bustillo heard the defendant scream that he had already killed the victim and that her children were next. When Bustillo returned to the room, the defendant's cousins had gone, and Mari and Carmen Sanchez were screaming. Mari was on the floor trying to resuscitate the victim, who had foam with blood coming out of her mouth. Bustillo relayed to the 911 operator that the defendant said that he had killed the victim and was going to kill her children next. The operator asked for the victim's home address, and Bustillo gave it to him. The defendant left the bar and got into his truck.

Bustillo testified that, after the defendant left the bar, "[h]e went in reverse and he made a lap around everything [and then] . . . came back in." The defendant took the unconscious victim by the arms and lifted her up, saying, "[W]ake up, stupid, don't fake like you're dead. Stop faking, wake up." The defendant put the victim over his shoulders like he wanted to carry her, but Mari told him that he could not take her. The defendant "let go of [the victim] and she fell to the floor," and he left. As the defendant was leaving, Bustillo heard a siren approaching. The defendant said, "[T]hat's what you-all wanted, that's what you-all wanted me to do" as he left. Bustillo understood the defendant's statement to mean

_____

[1] Because some of the witnesses share the same surname, we will at times refer to them by first name only for clarity. We intend no disrespect by this practice.

-3-

that he kept hitting the victim because they called the police.

Bustillo testified that firemen and police arrived on the scene. Approximately ten minutes after the defendant left the scene, he called Bustillo and said, "Augustin, forgive me. What did I do?" A police officer took Bustillo's phone and told him that he should not talk to the defendant. Bustillo then went to the police station and gave a statement. He also identified a photograph of the defendant as the person who assaulted the victim. Bustillo stated that he did not see the victim hit the defendant at any point during the altercation.

Carmen Sanchez, through an interpreter, testified that she worked as a waitress at Guadalajara Bar in May 2011 and, although not working on the night of the incident, was present at the bar and witnessed the assault. Carmen was familiar with the defendant because he was the victim's boyfriend and came to the bar frequently. She was already at the bar that night when the defendant arrived with three other people. Carmen was not drinking any alcohol that night, explaining that she was at the bar to keep her sister, Mari, company as she worked as a waitress.

Carmen testified that she heard the victim ask the defendant to leave so she could close the bar, and the defendant told her that they were not going to leave. The victim told him that she was going to ask someone to call the police if he did not leave, to which he responded, "What are you saying, bitch?" The defendant picked up a pool stick as if to hit the victim, but his friend got between them. The defendant's friend took the pool stick away, and the three friends tried unsuccessfully to get the defendant to leave.

Carmen testified that the victim went under the pool table, and the defendant grabbed her by the hair and pulled her out. The defendant hit the victim in the face and she screamed but then fell unconscious. The defendant's friends saw what was occurring and left. The defendant then began kicking the victim repeatedly all over her body. The victim never regained consciousness. Carmen said that her sister, Mari, told the defendant to stop, and he made a fist like he was going to hit her. Mari told the defendant that he could not hit her because she was pregnant, and he said, "So what[?]"

Carmen testified that the defendant left the bar, but came back and tried to pick up the victim, saying "Get up, you bitch, I haven't done anything to you, get up." Because the victim was unconscious, she did not stand up. Carmen recalled that, after the victim did not stand up, the defendant "didn't put her [down], he let her go." The defendant said to Carmen and the others remaining at the bar, "Is that what you wanted?" The defendant then left the bar. An ambulance arrived, followed by the police. Carmen went to the police station and provided a statement. Carmen stated that she had witnessed the defendant hit the victim on a prior occasion. Carmen tried to intervene and stop the defendant from hitting the victim

on that occasion, and the defendant grabbed her and "left [her] some bruises" as a result.

Through an interpreter, Mari Sanchez, Carmen's older sister, testified that she worked at Guadalajara Bar with the victim and was working the night of the assault. Mari was familiar with the defendant and noted that he came into the bar around 10:00 p.m. by himself on the night of the assault. She recalled that the defendant and the victim went into the storage room to talk and then the defendant left the bar. The defendant returned around 11:00 p.m. with three other people, apparently his cousins. Mari served the defendant and his cousins three buckets of beer, each containing six beers. Around midnight or 1:00 a.m., the victim asked the defendant and his cousins to leave so they could close the bar, but the defendant refused because he still had beer to finish. The defendant told the victim, "You get me out of here if you can." There was a brief exchange of words with the defendant's cousin, and the defendant appeared to get ready to hit the victim with a pool stick. The defendant's cousins intervened and took the pool stick from him and tried to take him outside. The defendant refused to leave, and his cousins left.

Mari testified that the victim crouched under the pool table, and the defendant pulled her out by the hair and hit her in the face with his fist. The victim screamed and fainted, falling to the ground. The defendant repeatedly hit and kicked the victim while she was lying unconscious on the floor. Mari screamed for the defendant to stop, and he came towards her like he was going to hit her as well. She told the defendant that he could not hit her because she was pregnant, and the defendant said, "So what[?]" Mari saw Bustillo grab the defendant by the hands from behind to try to stop the defendant from hitting the victim, and the defendant punched Bustillo in the stomach.

Mari testified that she was unsure whether the defendant finally stopped hitting and kicking the victim because he got tired, but he left the bar. The victim appeared to be dead when he left. The defendant returned and tried to pick up the victim. He let the victim fall by her own weight to the ground and said to her, "Get up, stupid, what are you doing . . . What are you faking like you're playing dead?"

Mari recalled that the victim's cell phone rang during the assault and the defendant told her, "Answer it, bitch," but the victim was unconscious. Mari never saw the victim regain consciousness during the attack. When the defendant left, he took the victim's cell phone with him. Mari waited at the scene for the police to arrive, then went to the police station and provided a statement.

Officer Justin Pinkleton with the Metropolitan Nashville Police Department testified that he responded to a domestic violence call at the Guadalajara Bar on the night of the assault. Officer Pinkleton spoke with witnesses, who informed him that the perpetrator was

the victim's boyfriend. Paramedics were on the scene working on the victim when he arrived. He was initially informed that the victim was in cardiac arrest and died on the scene. The paramedics later informed him that they successfully revived the victim and took her by ambulance to the emergency room. Officer Pinkleton called a domestic violence detective to investigate the case.

Bryan Jones, a paramedic with the Nashville Fire Department and District Chief over Logistics Operations, testified that he was dispatched to the scene of the assault at approximately 2:30 a.m. on May 3, 2011. The police had not yet arrived, and the victim was just inside the door of the bar being cradled by another individual. The victim did not have a pulse and was not breathing; she was essentially dead. The paramedics initiated cardiopulmonary resuscitation ("CPR"), immobilized and intubated her. They gave her Epinephrin twice in order to revive her heart. The victim's heart started beating but she did not start breathing again, so the paramedics inserted a breathing tube and took her to the hospital.

Detective Derry Baltimore with the Metropolitan Nashville Police Department testified that he assisted Detective Corey Wall in apprehending the defendant. They located the defendant based on a description of his vehicle, which was parked a few houses down from the defendant's address. Detective Baltimore knocked on the door, looked through a window, and saw the defendant lying on the couch. The detective knocked on the window, and the defendant got up and came outside. Backup officers were present to assist in apprehending the defendant. They took the defendant into custody without incident.

Detective Corey Wall, a homicide detective with the Metropolitan Nashville Police Department, testified that he investigated the assault and resulting death of the victim. Detective Wall interviewed Bustillo, and Carmen and Mari Sanchez at the police station, with the help of another detective serving as an interpreter. The witnesses told Detective Wall of the defendant's involvement and provided the address where the defendant and the victim lived. Detective Wall drafted a search warrant for the address, which he executed along with Detective Chad High and other officers. Among the items in the home, officers found fourteen photographs of the defendant, a pay stub in the defendant's name from Big River Brewery, and a couple of cell phones. The victim's son identified the defendant as his mother's boyfriend from the photographs. Bustillo identified the defendant as the person who committed the assault on the victim from the photographs. Detective Wall spoke with the manager of the Big River Brewery, who confirmed that the defendant worked there and identified him from the photographs.

Detective Wall testified that, after the defendant was apprehended, he spoke with him at the police station, with the help of an interpreter. The defendant was read his Miranda

rights, and the interview was videotaped. The defendant's sandals and clothing were collected during the interview, which were the same shoes and clothing the defendant indicated he was wearing during the assault. The defendant was placed under arrest after the interview. At that time, the victim was in critical condition, but she later died.

Felicia Evans, a crime scene investigator civilian employee of the Metropolitan Nashville Police Department, testified that she photographed the defendant at the police station after he was arrested. She specifically photographed the defendant's hands and the clothing he was wearing at the time of the assault. She noted that the photographs showed bruising on the defendant's knuckles. The defendant's shirt and jeans had what appeared to be reddish-brown stains on them, consistent with a "[m]edium velocity spot or stain . . . consistent with a beating, a bludgeoning, a stabbing or something of that type."

Detective William Stewart with the Metropolitan Nashville Police Department testified that he assisted in the investigation of the victim's assault and served as a translator during the interviews of the witnesses and the defendant. Officer Stewart read the transcript of the interview with the defendant, in which the defendant stated that he had been living with the victim and that they were experiencing problems in their relationship. He admitted that he was at the bar with a cousin and friends, drinking and playing pool since approximately midnight. The defendant claimed that the victim insulted one of his friends, and he became angry. He admitted that he grabbed and pushed the victim, hitting her two or three times. The victim fell to the floor and he wanted to pick her up, but she was unconscious and others in the bar wanted to leave her until the ambulance or police arrived.

The defendant continued in his statement, admitting to pushing one of his friends, as well as a "[p]otbellied" man whose name he could not recall. The defendant denied trying to hit the victim with a pool stick. When asked if he kicked the victim, the defendant admitted pulling her out from under the pool table but denied purposefully kicking her. He acknowledged hitting the victim in the stomach. He later admitted that he hit the victim in the head and kicked her in the stomach three times. The defendant said that he did not wait at the scene for the ambulance or police out of fear of getting in trouble. The defendant denied choking the victim.

Dr. Adele Lewis, the Deputy Chief Medical Examiner for Metropolitan Nashville, testified that, although she was not the pathologist who conducted the autopsy, she reviewed the notes and photographs from the autopsy, as well as the victim's medical records. The victim was treated at Vanderbilt Hospital for approximately one week before she was taken off life support. After review of the aforementioned materials, Dr. Lewis agreed that the victim's cause of death was complications of multiple, blunt-force injuries, and the manner of death was a homicide. Dr. Lewis noted that the victim had multiple bruises on her legs,

a large bruise on her arm, and bruising on her face and scalp. The doctor recalled that Vanderbilt Hospital placed the victim on a breathing machine, and inserted multiple intravenous lines to supply medications and a catheter to drain her urine. The victim also had a neck collar in case she had any broken bones in her neck. The victim never regained consciousness while in the hospital. The medical records indicated that the victim was dead upon arrival of the paramedics after the assault, but she was revived with CPR. However, the victim's physical condition continued to decline while she was in the hospital, and she was ultimately pronounced dead because her brain had become so swollen that it ceased functioning.

Dr. Lewis testified that the internal examination of the victim revealed multiple, deep bruises on her scalp that occurred either when her head hit an object or an object hit her head, and her brain became very soft with bleeding around the base and top of the brain. The victim's injuries were consistent with someone having kicked and punched the victim in the head. The bruises on the victim's legs and thighs were linear and consistent with having been hit with a pool stick.

After the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of second degree murder.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence in support of his second degree murder conviction. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be

given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain a conviction for second degree murder, the State had to prove beyond a reasonable doubt that the defendant committed a knowing killing of the victim. See Tenn. Code Ann. § 39-13-210(a)(1) (2010). Tennessee Code Annotated section 39-11-302(b) provides in pertinent part that "[a] person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

In the light most favorable to the State, the evidence showed that the defendant repeatedly punched and kicked the victim all over her body, including her head, even after she lost consciousness. The defendant punched another bar patron who attempted to intervene. The attack on the victim grew so vicious that the defendant's friends tried to make

him stop and took a pool stick away from him to prevent him from hitting the victim with it. After he stopped, the defendant screamed that he had killed the victim and that her children "would be next." The victim suffered severe injuries from the attack, her brain swelled, and she died a week later. This evidence is sufficient for a rational trier of fact to conclude that the defendant knowingly killed the victim.

The defendant contends that it was simply a fight that had "gotten out of hand"; however, there was no proof that the victim ever hit or even fought back against the defendant's vicious and unrelenting attack. The defendant also suggests that, because he had been drinking, "he was unaware that the overall effect of his actions would be the death of the victim." However, evidence of the defendant's alcohol consumption was before the jury, which determined, in its province, that such did not affect the defendant's awareness of his actions. The defendant is not entitled to relief on this issue.

## II. Grand Jury Foreman

The defendant also argues that the indictment against him was invalid as a matter of law because the foreman of the grand jury was a convicted felon. He asserts that he could not have objected to such before trial because "if [the] State did not know the foreman was a felon, then how could [he]."

This exact issue appears to be a case of first impression. Our research has revealed prior cases dealing with the competency of a member of the petit jury, but not the grand jury. Those cases held that an objection to the competency of a juror is an objection "propter defectum," which "must have been made before the verdict, and ignorance of the fact does not excuse the omission." Goad v. State, 61 S.W. 79, 80 (Tenn. 1900); see also Walker v. State, 99 S.W. 366, 366-67 (Tenn. 1907); State v. Joseph D. Bishop, No. 01C01-9309-CR-00333, 1994 WL 474874, at *2-3 (Tenn. Crim. App. Sept. 1, 1994), perm. app. denied (Tenn. Jan. 3, 1995). Although such cases are interesting, the defendant's challenge is more particularly classified as a challenge to the validity of the indictment due to the grand juror's incompetence.

Rule 12(b)(2)(B) of the Tennessee Rules of Criminal Procedure provides that a motion alleging a defect in the indictment, presentment, or information must be raised before trial but that "at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense[.]" Id. "'Lack of jurisdiction' refers to subject matter jurisdiction," State v. Nixon, 977 S.W.2d 119, 120 (Tenn. Crim. App. 1997), which refers to a court's authority to adjudicate a dispute brought before it. Freeman v. CSX Transp., Inc., 359 S.W.3d 171, 176 (Tenn. Ct. App. 2010). "[A]ll objections or defects in the indictment[,] other than those [related to the subject

matter jurisdiction of the court and failure to charge an offense,]" must be raised prior to trial or will result in waiver. Nixon, 977 S.W.2d at 121.

The defendant's case was tried before the Davidson County Criminal Court, which has subject matter jurisdiction over crimes occurring within Davidson County. See Tenn. Code Ann. § 16-10-102. The status of the grand jury foreman as a convicted felon does not relate to the power of the court to hear and decide a case. Moreover, the defendant does not contend that the indictment failed to charge an offense. Neither of the narrow exceptions permitting objections to an indictment after trial applies; therefore, the defendant waived any objection to the grand jury foreman's status as a felon because it was not raised prior to trial.

Moreover, the historic doctrine of aider by verdict stands for the proposition that any defects in the indictment are cured if the jury reaches a verdict. See, e.g., Kimbro v. Bomar, 333 F.2d 755, 757 (6th Cir. 1964); Allen v. State, 288 S.W.2d 439, 440 (Tenn. 1956); Jones v. State, 277 S.W.2d 371, 372 (Tenn. 1955); Driscoll v. State, 232 S.W.2d 28, 29 (Tenn. 1950); Pope v. State, 258 S.W.775, 776 (Tenn. 1924); State v. Smith, 7 Tenn. 165 (Tenn. 1823). In this case, the jury deliberated and returned a verdict of guilty of second degree murder and, by doing so, cured any defect in the indictment. The defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE